UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

YACOUB ISEID,                                    Case No.
                                                 Hon.
              Plaintiff,

v.

CITY OF BIRMINGHAM

              Defendant.
_____/

| | |
|---|---|
| ERIC STEMPIEN (P58703) <br> LAUREN A. GWINN (P85050) <br> STEMPIEN LAW, PLLC <br> Attorneys for Plaintiff <br> 38701 Seven Mile Road, Suite 130 <br> Livonia, MI 48152 <br> (734)744-7002 <br> eric@stempien.com <br> lgwinn@stempien.com | |

_____/

## **COMPLAINT AND JURY DEMAND**

PLAINTIFF, Yacoub Iseid, by and through his attorneys, STEMPIEN LAW, PLLC, complains against Defendant, City of Birmingham, and in support thereof states:

1.     Plaintiff, Yacoub Iseid ("Iseid" or "Plaintiff") is a resident of the Village of Holly, Oakland County, Michigan.

1

2.     Defendant, City of Birmingham, is a municipality in the City of Birmingham, Oakland County, Michigan.

3.     Jurisdiction is vested in this Court pursuant to 28 USC §1331, 42 USC §1981, and 42 USC §2000e, et. seq.

4.      Supplemental jurisdiction over Plaintiff's state law claims is proper pursuant to 28 USC §1367.

5.     Venue is proper in this Court because the events giving rise to this Complaint occurred in the Eastern District of Michigan.

6.      Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission, the EEOC issued a Notice of Right to Sue on October 17, 2023, and this Complaint is filed within 90 days of the issuance of the Notice.

## **GENERAL ALLEGATIONS**

7.     Plaintiff began his employment with Defendant in or about January 2014.

8.     In approximately 2017, Plaintiff applied for a position with Oakland County's Narcotic Enforcement Task Force, led by Sergeant Mike Lyon.

9.     Plaintiff, who is of Palestinian descent, was passed over for a less qualified white officer named Seth Barone.

10.    When denied this position with the Drug Enforcement Task Force, Plaintiff was instructed by Sergeant Lyon to seek the advice of another officer to see what he could do to better position himself for a position with the task force.

2

11.     Plaintiff was, unfortunately, told by a Lieutenant, that one of the reasons Plaintiff was passed over for the position because he was a "fat rock."

12.     Shortly thereafter, Sergeant Lyon left the Narcotic Enforcement Task Force and became Plaintiff's patrol supervisor.

13.     Under Sergeant Lyon's direction, Plaintiff was supposed to learn about the work involved in the Narcotic Enforcement Task Force.

14.     Sergeant Lyon, however, decided that the educational experience the Plaintiff needed was one directed towards making him "tougher" and "thickening his skin."

15.     Sergeant Lyon's pedagogical method, unfortunately, was centered around hurling racist epithets. Sgt. Lyon would continually refer to Plaintiff as a "terrorist," "a bomber," making jokes about his ethnic background, and using the "n word" in regular conversation.

16.      While a member of the Birmingham Police Department Plaintiff would regularly have to respond to calls about "suspicious" people, these suspicions were routinely based on an individual's race. This included responding to calls about individuals of Arabic descent.

17.     Following the direction of Sergeant Lyon, other officers in the Birmingham Police Department followed suit and further subjected Plaintiff to similar racially charged and national origin based insults.

18.     The Birmingham Police Department, in particular under the leadership of Sergeant Lyon, had a culture of outward racial animus, including but not limited to derogatory remarks about Arab American individuals.

19.     After a year of this pervasive abuse, Plaintiff transferred to the midnight shift, away from Sergeant Lyon. Unsurprisingly, the level of racial abuse Plaintiff endured was substantially reduced, though not eliminated.

20.     In approximately 2019, Plaintiff again applied for a position on the Narcotic Enforcement Task Force. The white officer who had been chosen over Plaintiff in 2017 had been fired. The white officer, Seth Barone, was deemed to be a poor fit.

21.     This time, three officers applied for the position. Plaintiff, an Arab American with six years' experience on the force and a drug recognition expert; Nick Hill, an African American with two years' experience on the force; and Alex Linke, a white individual with one year experience on the force.

22.     In the interview process, Plaintiff was told that he needed "tougher skin," and that Sergeant Lyon had called the interviewers to express this opinion.

23.     Unsurprisingly, the one white candidate, Alex Linke, who had the least experience, was chosen for this position. Further, Linke had made numerous false arrests for driving under the influence of drugs that were dropped.

24.    Approximately two weeks after his interview Plaintiff began feeling distraught, recognizing that Sergeant Lyon had gone out of his way to impede Plaintiff's career opportunities.

25.    Consumed by anxiety and depression, Plaintiff left a Friday shift early and took the rest of the weekend off, using sick days, to recalibrate his mental state.

26.    Over the course of the weekend that Plaintiff called off, he attended a baptism and a birthday party.

27.    Unfortunately, another officer on the force saw pictures from the familial celebrations that Plaintiff attended and reported it to Plaintiff's supervisor.

28.    As a result, Plaintiff was required to attend a meeting with his supervising Lieutenant and Sargeant.

29.    At the meeting the Lieutenant was demonstrably angry and raising his voice.

30.    Following the meeting with his supervisors, Plaintiff was placed on administrative leave.

31.    Approximately two weeks after being placed on administrative leave, Plaintiff reached out to the Chief of Police, who informed Plaintiff that he would be required to undergo a "fit for duty" evaluation with a psychologist.

32.    Following Plaintiff's "fit for duty" evaluation, Plaintiff had a meeting with Birmingham Police Department's Chief of Police, Human Resources, and a union representative.

33.    At this meeting the Chief of Police berated Plaintiff and told him to "shut up" when he tried to defend himself.

34.    Plaintiff was instructed that he would be placed on paid administrative leave until he began therapy.

35.    After this meeting, Plaintiff attended therapy with Dr. Joseph Zambo. In these sessions Plaintiff opened up about the racial discrimination he faced within the Birmingham Police Department.

36.    Dr. Joseph Zambo sent Plaintiff back to work with no restrictions after 10 sessions.

37.    Prior to Plaintiff being placed on administrative leave he was consistently one of the highest rated officers in the Birmingham Police Department. Following this incident Plaintiff's annual evaluation score dropped by over thirty-percent.

38.    Plaintiff wrote in one of his annual employee evaluations that he needed to become better at dealing with racism in the workplace.

39.    Following Plaintiff's administrative leave, he was told by the Chief of Police and Human Resources that he would be required to meet with "an outside attorney," to conduct an investigation on Plaintiff's complaints in his evaluation.

40.    The investigation was closed without Plaintiff having undergone an interview.

41.    Plaintiff was then required to meet again with Dr. Clark.

42.    At this meeting, Dr. Clark informed Plaintiff that he was fit to return to work.

43.   Dr. Clark, however, failed to send documents supporting this assertion to the Birmingham Police Department.

44.   Shortly thereafter, and much to Plaintiff's surprise, he was required to visit Dr. Clark again in August 2020.

45.   Plaintiff was told at this meeting with Dr. Clark that the meeting was scheduled at the behest of Human Resources Manager, Ben Myers.

46.   Dr. Clark assured Plaintiff that he would be cleared to return to work, finding that his psychological evaluation was satisfactory.

47.   Following this third evaluation with Dr. Clark, the Lieutenant told Plaintiff that the Chief of Police would alert him when he was cleared to return to work. Plaintiff, however, never received any word from the Chief of Police.

48.   Race and/or National Origin were the motivating factors in Defendant's disparate treatment of Plaintiff.

49.   Race and/or National Origin were the motivating factors in Defendant's decision to impede Plaintiff's promotion and growth opportunities.

50.   Race and/or National Origin were the motivating factors in Defendant's decision to subject Plaintiff to unnecessary psychological evaluations.

51.   Race and/or National Origin were the motivating factors in Defendant's decision to impede Plaintiff's return to the force following his psychological evaluations.

52.     Due to the severe treatment Plaintiff endured while working at Defendant, Plaintiff was constructively discharged in January 2021.

53.     Race and/or National Origin were the motivating factors in the constructive discharge of Plaintiff.

**COUNT I**
**VIOLATION OF TITLE VII**
**RACE DISCRIMINATION**

54.     Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

55.     Title VII of the Civil Rights Act of 1964 ("Title VII"), specifically 42 USC §2000e-2, provides that "it shall be an unlawful employment practice for an employer … to … discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race…"

56.     At all pertinent times, the Defendant was an employer, covered by and within the meaning of Title VII.

57.     Plaintiff was an employee of Defendant.

58.     Plaintiff is a member of a protected class because of his race.

59.     Plaintiff was qualified for his position.

60.     Plaintiff suffered adverse employment actions, including, but not limited to: discipline, increased harassment, refusal of promotion, and constructive discharge.

61.    The Defendant's stated reasons for the adverse employment actions were false.

62.    The Defendant's stated reasons for the adverse employment actions were pretext for race discrimination.

63.    Other employees, who were similarly situated to Plaintiff, engaged in the same or similar conduct, and were not subjected to the same adverse employment actions as Plaintiff.

64.    Plaintiff was disciplined because of his race.

65.    As a direct and proximate result of Defendant's violations of Title VII, Plaintiff has suffered damages, including, but not limited to: lost past and future wages, lost past and future employment benefits, loss of earning capacity and emotional distress.

**COUNT II**
**VIOLATION OF TITLE VII**
**NATIONAL ORIGIN DISCRIMINATION**

66.    Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

67.    Title VII of the Civil Rights Act of 1964 ("Title VII"), specifically 42 USC §2000e-2, provides that "it shall be an unlawful employment practice for an employer … to … discharge any individual, or otherwise discriminate against any

individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's . . . national origin…"

68.     At all pertinent times, the Defendant was an employer, covered by and within the meaning of Title VII.

69.     Plaintiff was an employee of Defendant.

70.     Plaintiff is a member of a protected class because of his national origin.

71.     Plaintiff was qualified for his position.

72.     Plaintiff suffered adverse employment actions, including, but not limited to: discipline, increased harassment, refusal of promotion, and constructive discharge.

73.     The Defendant's stated reasons for the adverse employment actions were false.

74.     The Defendant's stated reasons for the adverse employment actions were pretext for national origin discrimination.

75.     Other employees, who were similarly situated to Plaintiff, engaged in the same or similar conduct, and were not subjected to the same adverse employment actions as Plaintiff.

76.     Plaintiff was disciplined because of his national origin.

77.     As a direct and proximate result of Defendant's violations of Title VII, Plaintiff has suffered damages, including, but not limited to: lost past and future

wages, lost past and future employment benefits, loss of earning capacity and emotional distress.

**COUNT III**
**VIOLATION OF TITLE VII CIVIL RIGHTS ACT**
**HOSTILE WORK ENVIRONMENT**

78.    Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

79.    Plaintiff was subjected to consistent harassment based on his racial and national origin, including being referred to as a "terrorist" and "bomber."

80.    This use of the above-mentioned hostile language was unwelcome.

81.    The racial and national origin abuse Plaintiff suffered was so severe and pervasive as to constitute a hostile work environment.

82.    Plaintiff perceived the work environment with Defendant to be both abusive and hostile. The extent of the abuse Plaintiff endured was so severe that he was forced to change to a less desirable shift and even then, he continued to endure racial and national origin abuse.

83.    A reasonable person in Plaintiff's position would consider the work environment with Defendant abusive and hostile.

84.    As a direct and proximate result of Defendant's violations of Title VII, Plaintiff has suffered damages, including, but not limited to: lost past and future

wages, lost past and future employment benefits, loss of earning capacity and emotional distress.

## COUNT IV
## VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT RETALIATION

85.    Plaintiff hereby incorporates all previous paragraphs of this Complaint as if fully set forth herein.

86.    Plaintiff engaged in protected activity when he opposed the race-based harassment and national origin- based harassment that he suffered during his employment with Defendant.

87.    Defendant knew of Plaintiff's protected activity.

88.    Plaintiff suffered adverse employment actions, including, but not limited to: increased harassment, write-ups, mandatory psychological evaluations, administrative leave, and constructive discharge.

89.    There is a causal connection between the protected activity and the adverse employment actions.

90.    As a result of the foregoing, Plaintiff has suffered damages, including but not limited to: lost past and future wages, loss of earning capacity and severe emotional distress.

## COUNT V
## VIOLATION OF 42 USC §1981
## HARASSMENT-HOSTILE WORK ENVIRONMENT

91.    Plaintiff hereby incorporates all previous paragraphs of this Complaint as if fully set forth herein.

92.    By the conduct described above, Defendant intentionally deprived Plaintiff of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of their contractual employment relationship with Defendant in violation of 42 USC §1981.

93.    Plaintiff was subjected to harassment as fully described above by Defendant.

94.    Defendant's conduct was not welcomed by Plaintiff.

95.    Defendant's conduct was racially motivated by the fact that Plaintiff is Palestinian.

96.    The conduct was so severe or pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile or abusive.

97.    Plaintiff believed his work environment to be hostile or abusive as a result of Defendant's conduct.

98.    Plaintiff was constructively discharged as a result of the hostile work environment.

99.    As a direct and proximate result of Defendant's violation of 42 USC §1981, Plaintiff has suffered damages as fully set forth in paragraph 65 of this Complaint.

100.    In addition, Defendant's conduct was done with reckless disregard for Plaintiff's federally protected civil rights, entitling Plaintiff to punitive damages.

**COUNT VI**
**VIOLATION OF ELLIOTT LARSEN CIVIL RIGHTS ACT**
**RACE AND NATIONAL ORIGIN DISCRIMINATION**

101.    Plaintiff hereby incorporates all previous paragraphs of this Complaint as if fully set forth herein.

102.    The ELCRA prohibits employers from discriminating against any individual regarding the compensation, terms, conditions, or privileges of employment because of the employer's race and/or national origin.

103.    At all material times, Plaintiff was an employee, and Defendant was his employer, covered by and within the meaning of Michigan's Elliott Larsen Civil Rights Act.

104.    Plaintiff was qualified for his position.

105.    Plaintiff was harassed by Defendant's agents and employees throughout the course of his employment for reporting racial and national origin harassment by Defendant.

106.    The harassment included, but is not limited to, unwelcome comments and conduct of an offensive nature directed at Arab American employees, the use of racial epithets, and the creation of a hostile work environment.

107.    Plaintiff complained about harassment, discrimination, and the events described above to his supervisors and Defendant's Human Resources Department.

108.    Defendant did not promptly remedy the ongoing race and/or national origin harassment when Plaintiff complained.

109.    Defendant permitted racial and/or national origin harassment to continue and instead instructed Plaintiff to be less sensitive to the harassment.

110.    The conduct of Defendant's agents and employees in harassing Plaintiff constitutes race and/or national origin discrimination in violation of the ELCRA.

111.    As a result of the foregoing, Plaintiff has suffered damages, including but not limited to: lost past and future wages, loss of earning capacity and severe emotional distress.

## COUNT VII
## VIOLATION OF ELLIOTT LARSEN CIVIL RIGHTS ACT
## RETALIATION

112.    Plaintiff hereby incorporates all previous paragraphs of this Complaint as if fully set forth herein.

113.    Plaintiff engaged in protected activity when he opposed the racial harassment and national origin harassment that he suffered during his employment with Defendant.

114.    Defendant knew of Plaintiff's protected activity.

115.    Plaintiff suffered adverse employment actions, including, but not limited to: increased harassment, administrative leave, constructive discharge, and being passed up for promotions in favor of white employees who were less qualified.

116.    There is a causal connection between the protected activity and the adverse employment actions.

117.    As a result of the foregoing, Plaintiff has suffered damages, including but not limited to: lost past and future wages, loss of earning capacity and severe emotional distress.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury of the within cause.


*/s/ Lauren A. Gwinn*
ERIC STEMPIEN (P58703)
LAUREN A. GWINN (P85050)
Attorneys for Plaintiff

Dated: January 15, 2024